**YATES RANCH OIL & ROYALTIES et al.**
**v. JONES et al.**

No. 8718.

Circuit Court of Appeals, Fifth Circuit.

Dec. 16, 1938.

Jos. W. Bailey, Jr., and C. J. Shaeffer, both of Dallas, Tex., for appellants.

Stanley Boykin and H. C. Ray, both of Fort Worth, Tex., for appellees.

Before SIBLEY and HUTCHESON, Circuit Judges, and DEAVER, District Judge.

SIBLEY, Circuit Judge.

Two stockholders, owning respectively five and fifty-five shares out of a total of sixty thousand shares of stock in Yates Ranch Oil and Royalties Company, on May 4, 1936, filed in behalf of all stockholders a bill in the District Court against the corporation and C. A. Everts, who since April, 1930, had been its president and manager. It charged a corrupt bargain on the part of Everts with one Hoover, who preceded him as president, whereby Everts paid Hoover $10,000 for seventy-nine shares of stock and the presidency of the Company; that Everts had since by misrepresentation to the eighteen hundred stockholders obtained each year their proxies by which he elected dummy directors and continued in power; that he had mismanaged the corporation, paid himself and his wife unreasonable and unearned sums, and was about to dissipate $40,000 which would soon be received in cash from oil royalties held up by the pipe line companies during a long litigation. An account with Everts was prayed, and a recovery for the Company against him of the $10,000 paid Hoover, and of what Everts had wrongfully diverted, and a receiver to take the Company's affairs in hand. Discovery under oath was neither prayed nor waived.

The answer, sworn to positively by Everts, denied all the wrongdoing charged and made a showing of honest and economical administration of the corporate affairs during a very trying time and under ad-

verse circumstances. Everts offered to make good any sum which it might be found he had improperly received. There was also a motion to dismiss on the ground that the complainants, holding but one-tenth of one percent of the stock, had shown no right to act for the corporation or disturb its affairs.

The motion to dismiss was overruled. After hearing evidence, on Nov. 20, 1937, a decree was made ordering an account to be taken between the corporation and Everts. It continued; "The Court is of the opinion that the affairs of the respondent corporation have been mismanaged by the said C. A. Everts, and that on account of the great number of stockholders, who live in many parts of the United States and other countries, it would be impossible to secure concerted action of said stockholders to elect proper officers of said corporation; that all the assets and properties of said corporation should be impounded and sold to the best advantage, and distribution of the proceeds made to said stockholders; it is therefore ordered, adjudged and decreed that" a named receiver be appointed, directed to employ counsel and take over the business; and Everts was enjoined from interfering with or from disposing of assets or the books of the corporation. This appeal, the receivership being superseded, asserts that a receiver should not have been appointed, and that the bill should have been dismissed.

 On the face of the bill there was enough to justify an inquiry into what, if anything, the president and manager of the corporation owed it. The allegations were that the two other directors were one a member of his family and the other a clerk in his office, so that they could not be expected to sue him in behalf of the corporation. The stockholders were alleged to exceed eighteen thousand in number, to average in ownership only four shares each of a par value of $1 per share; that their names and addresses were unknown to the complainants and they were widely scattered and had never attended any stockholders' meeting, and that it was practically impossible to obtain concerted action by them. If these two stockholders, small though their interest is, are willing to assume the labor and responsibility of recovering this supposed asset of the Company in behalf of all, a court of equity without great risk of doing an injustice might countenance it. But the phase of

the bill which sought a receivership and the taking of the general affairs of the corporation out of the hands of those elected to manage them by the body of the stockholders is a much more serious matter. If the majority are satisfied with the management and desire to continue Everts in control, a small minority ought to be held strictly to the preliminaries required to enable them to sue in behalf of the corporation. They assert no advantage taken of them by the majority, but present only contentions in which their interest is exactly like that of every other stockholder. The broad questions of who should be president and manager and directors, and whether the business should be carried on or terminated, ought to be decided by the stockholders in meeting, and not by a court at the instance of shareholders having a one-thousandth interest and a total par value investment of $60.00. We said in Stone v. Holly Hill Fruit Products Co., 5 Cir., 56 F.2d 553, where the corporate officers were sought to be dispossessed by minority stockholders [page 554]: "It is not alleged that there is any wrong combination of a majority of the stockholders, but only that they live at a distance, are ignorant of the situation, and send their proxies to the president. The plain remedy for that would be to seek another stockholders' meeting, after informing the other stockholders of the situation and asking them to withdraw their proxies and to attend. A stockholder, in taking stock in the ordinary corporation, submits, within the charter limits, to a guidance of the corporate affairs according to the will of the owners of a majority of the stock and through the directors whom the majority choose. The minority have a right to have the majority exercise their judgment, and to exercise it honestly and not fraudulently, but have no right to have a court substitute their own ideas and wishes for those of the majority, and that in advance of any refusal of the majority to hear and decide on the matter at issue." These complainants as stockholders had a right to inspect the books of their company, and to learn who the stockholders are and their addresses. That they are numerous does not authorize two to act for all, there being no sudden emergency. If such a rule were established, the largest corporations might be embarrassed by many suits thus brought by slight stockholdings without any previous effort to ascertain by the usual means the will of the majority. This bill could

not be retained for the purpose of ousting corporate officers or ending the corporate enterprise. Only because it also seeks the adjustment of an account with the person in sole control of the corporation who could not sue himself, do we affirm the refusal to dismiss it.

■ What we have said amounts to a reversal of the appointment of a receiver. A reversal is further required by a consideration of the evidence. It appears that these complainants through the same attorneys had previously filed a bill for a receiver in a State court, and had abandoned it. They had never attended the stockholders' meetings, which were held on a date in April each year, nor asked to see the books, nor sought to know who or where the other stockholders were. It appears that though Everts is the largest stockholder, owning nine thousand shares, two others have each about two thousand shares and had been invited by Everts to become directors but had declined. A stockholders' meeting was held in April, 1937, pending this suit. Everts in sending out the notice of it advised each stockholder of the suit in the State court, and of this renewal of it in the federal court, and of the nature of the charges made against him, and stated his version of the matter. The stockholders sent him their proxies as before, instead of coming to investigate or to rebuke him. Not one has intervened in this suit.

On the merits of the charges we think the proof is very weak. The answer having positively sworn off the charges of the bill, the burden devolved on the complainants to sustain them. We say nothing about the old rule of proof in equity where discovery is not waived. The complainants used as witnesses only Everts himself, who on most points sustained his answer by his testimony, and his bookkeeper who explained the entries on the books. There were no false or altered entries or suppressed transactions, but everything was plain and open. Everts testified, as he had answered, that he did not pay Hoover $10,000 or any other sum to become president, but had personally entered on a joint adventure with him about the same time in wholly different property. As to this company, Hoover was about to be indicted for a mail fraud in promoting it, as his fellow worker Reardon had already been, and Hoover was trying to disconnect himself from the company for its good. So far from Everts paying Hoover anything, Hoover gave Everts the seventy-nine shares of stock which stood in Hoover's name, then worth only $7.90. This is uncontradicted, and must be taken as true, removing the most serious cloud upon Everts' record with this Company. The books show that the Company's monthly expenses were very heavy when Everts took hold in April, 1930, and his first letter and report to stockholders contained proposals for reducing them, and for other changes in the operation of the Company, on which he asked them to give an advisory vote. He in fact did rapidly reduce expenses, and by 1932 had abandoned a separate office and office force by using his own office and office force for the Company's business, charging a flat $100 per month for the entire service, including his own work as president and manager. The stockholders from year to year were advised of this charge. The directors are said to have agreed to it. It is, however, contended to be unreasonable, and it is alleged that some $600 was paid to Everts' wife in addition. Everts claims this was prior to the flat arrangement, and was for stenographic service rendered by her. By 1932 the income of the Company, which arose wholly from royalties, was cut off almost completely by litigations which tied up payments until 1936. Taxes, however, continued, as did the cost of reports to stockholders and service expenses. The Company on April 23, 1932, had $5,000 on hand, which the directors instead of paying out as a dividend loaned to Everts on a note at six percent interest. The following February $2,000 was repaid, and after that the balance with accruing interest was from year to year offset by crediting Everts' service charge of $1,200 per year. Since July, 1935, the service charge has gone unpaid. One of the directors, a certified public accountant and at one time the State Auditor of Texas and now Administrator of the Old Age Pension Commission, is apparently a substantial man. He testified that he approved these transactions in the exercise of his own judgment; that Everts had a net worth of half a million dollars or more, had ample credit at the bank, and the note could have been collected at any time. Perhaps the most serious question of maladministration relates to the nonpayment of the franchise tax of the Company, which automatically suspended its right to do business. The default occurred before Everts took charge, but he

422

at once discovered it. He reported it to the shareholders, but said he had paid it up. He testifies that he did issue a check for that purpose but the Secretary did not send it. He later listed the tax as unpaid in a statement to the stockholders. The Company was in fact doing no business, and counsel advised against payment of the tax because based on an inflated value of the stock. It went unpaid until complainants' first suit was filed and was then compromised and paid without penalty. The Company actually lost nothing by the delay. The letters to stockholders are of the promotional type. They seem to contain some boasting, some exaggeration and some suppression. Everts is concededly solvent. He professes a willingness to account and repay anything he has charged amiss. We find no such showing of fraud or mismanagement as would justify a receivership to supersede him, or an injunction against his continuing to function as the manager of the Company. The books are open and the "lid is off". We leave the way free for the complainants to proceed with the account they seek, expressing no opinion as to any item of it. We reverse the appointment of the receiver and the grant of the injunction. The cause is accordingly remanded for further proceedings not inconsistent herewith.